**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ALEXIS SHEA STEWART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **CARCARE LLC and CARSMART, LLC,** | ) | **JURY DEMAND** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

# COMPLAINT

Plaintiff Alexis Shea Stewart, by and through counsel, files this Complaint against Defendants CarCare LLC and CarSmart, LLC, and states as follows:

## NATURE OF THE ACTION

1. This is an action for pregnancy discrimination, disability discrimination, failure to accommodate, and retaliation.

2. On or about September 24, 2025, Ms. Stewart told her supervisor she was pregnant.

3. Defendants fired her on November 3, 2025, forty days later.

4. Ms. Stewart brings claims under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg *et seq.* ("PWFA"); the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"); the Tennessee Pregnant Workers Fairness

Act, Tenn. Code Ann. § 50-10-101 *et seq.* ("TPWFA"); and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 ("TDA").

## PARTIES

5. Plaintiff Alexis Shea Stewart is an adult female who resides in Hendersonville, Sumner County, Tennessee.

6. Defendant CarCare LLC ("CarCare") is a Tennessee limited liability company.

7. CarCare's principal office is located at 1023 West Main Street, Hendersonville, Tennessee 37075.

8. CarCare operates an automotive repair shop in Hendersonville under the name CarCare Import & Domestic Service.

9. CarCare may be served through its registered agent, Guy Alfieri, 1023 West Main Street, Hendersonville, Tennessee 37075.

10. Defendant CarSmart, LLC ("CarSmart") is a Tennessee limited liability company.

11. CarSmart's principal office is also located at 1023 West Main Street, Hendersonville, Tennessee 37075.

12. CarSmart operates a used car dealership in Hendersonville.

13. CarSmart may be served through its registered agent, Guy Alfieri, 1023 West Main Street, Hendersonville, Tennessee 37075.

14. This Complaint refers to CarCare and CarSmart together as "Defendants."

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4) because this action arises under federal law.

16. This Court also has jurisdiction over the Title VII claim under 42 U.S.C. § 2000e-5(f)(3).

17. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

18. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices occurred in Sumner County, Tennessee.

**DEFENDANTS ARE ONE INTEGRATED EMPLOYER**

19. Guy Alfieri owns CarCare and CarSmart.

20. Defendants list the same principal office with the Tennessee Secretary of State: 1023 West Main Street, Hendersonville, Tennessee 37075.

21. Defendants list the same mailing address with the Tennessee Secretary of State: 909 Harpeth Valley Place, Nashville, Tennessee 37221.

22. Defendants have the same registered agent, Guy Alfieri.

23. CarCare's shop serves as the service facility for CarSmart's dealership at 1023 West Main Street in Hendersonville.

24. Guy Alfieri and his son, Chris Alfieri, made hiring decisions for both Defendants.

25. Chris Alfieri is CarCare's Service Manager.

26. Defendants shared accounting and payroll staff.

27. Dana Hartman processed payroll and invoices and served as a human resources contact for CarCare employees.

28. Misty Bowling performed accounting work mainly for CarSmart.

29. Ms. Bowling also cut paychecks for CarCare employees when Ms. Hartman was unavailable.

30. Defendants shared the same human resources function.

31. Upon information and belief, a driver named Harold ran errands for both Defendants and was paid by both.

32. Every vehicle CarSmart sold ran through CarCare's shop for inspection.

33. CarCare's technicians worked on CarSmart vehicles every day.

34. Several CarCare technicians worked mainly on CarSmart vehicles.

35. CarCare employees could not perform work on a CarSmart vehicle without approval from Shawn Bowers, CarSmart's sales manager, or from Guy Alfieri.

36. Mr. Bowers regularly came into CarCare's shop to oversee work on CarSmart vehicles.

37. Defendants used a shared group text message to coordinate inspections and repairs of vehicles CarSmart bought at auction for resale.

38. Guy Alfieri kept up with shop operations through the shared group message.

39. CarCare paid bills owed by CarSmart.

40. Defendants market themselves together.

41. A video on CarCare's website is titled "Take a look around CarSmart and CarCare."

42. CarSmart's website advertises auto repair services in Hendersonville.

43. CarSmart's website promotes an award earned by CarCare.

44. CarSmart, LLC has been a Tennessee limited liability company since 2002.

45. CarCare LLC was formed in 2013.

46. CarCare's website states CarCare has served Hendersonville "since 1998."

47. Guy Alfieri opened CarSmart in 1998.

48. CarCare's website directs customers who wish to buy a vehicle to CarSmart's website.

49. CarSmart's website calls CarCare's shop "[o]ur service facility."

50. CarSmart's website calls the repair business "CarSmart CarCare."

51. CarSmart's website tells customers to ask their "service advisor" about loaner vehicles.

52. CarCare's service advisors, including Ms. Stewart, served CarSmart's customers.

53. CarSmart promises its buyers "[p]riority placement in our service line."

54. CarSmart's service line is CarCare's shop.

55. CarSmart publicly lists CarCare's telephone number, (615) 822-5002, as CarSmart's service and parts number.

56. At least one customer review of CarSmart thanks a CarCare employee by name.

57. At least one public reply to a review of CarSmart is signed "The CarCare Team."

58. Defendants filed their annual reports with the Tennessee Secretary of State on the same day in six of the last seven years, usually within minutes of each other.

59. Guy Alfieri publicly describes himself as owning and operating both CarSmart and CarCare.

60. Defendants share common ownership, common management, centralized control of labor relations, and interrelated operations.

61. Defendants are a single, integrated employer.

62. In the alternative, Defendants jointly employed Ms. Stewart.

63. Upon information and belief, Defendants together employed fifteen or more employees for each working day in each of twenty or more calendar weeks in 2024 and in 2025.

64. Defendants are engaged in an industry affecting commerce.

65. Defendants are an "employer" under 42 U.S.C. § 2000e(b) and a "covered entity" under the PWFA and the ADA.

66. Defendants are an "employer" under the THRA, the TPWFA, and the TDA.

## ADMINISTRATIVE EXHAUSTION

67. On May 4, 2026, Ms. Stewart filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 494-2026-03205.

68. Ms. Stewart asked the EEOC to dual-file the charge with the Tennessee Civil Rights Enforcement Division.

69. The charge alleged discrimination because of sex and pregnancy, denial of accommodations, and retaliation, in violation of Title VII, the PWFA, and the ADA.

70. The charge stated Ms. Stewart's high-risk pregnancy required accommodations.

71. The charge expressly invoked the ADA.

72. In its position statement, CarCare denied discriminating against Ms. Stewart because of any disability or any request for accommodation.

73. Ms. Stewart's disability and accommodation claims were within the scope of the charge and the EEOC's investigation.

74. Ms. Stewart timely filed her EEOC charge on May 4, 2026.

75. The charge named CarCare.

76. CarSmart shares an identity of interest with CarCare through common ownership, a common registered agent, a common principal office, and common management.

77. Upon information and belief, CarSmart received actual notice of the charge through Guy Alfieri, the owner and registered agent of both Defendants.

78. On August 4, 2026, the EEOC issued a Determination and Notice of Rights. A copy is attached as Exhibit A.

79. Ms. Stewart filed this action within ninety days of receiving the Notice of Rights.

80. Ms. Stewart filed this action within one year of her termination.

81. Ms. Stewart has satisfied all conditions precedent to filing this action.

## FACTUAL ALLEGATIONS

82. CarCare hired Ms. Stewart in March 2025 as an Automotive Service Advisor.

83. CarCare hired Ms. Stewart in part because of her long tenure with her previous employer.

84. As a Service Advisor, Ms. Stewart greeted customers, prepared repair orders and estimates, dispatched work to technicians, kept customers informed, and maintained customer records.

85. Ms. Stewart worked with CarSmart vehicles and CarSmart personnel daily.

86. Ms. Stewart was paid a weekly base salary plus commission.

87. Her commission depended on the dollar value of the repair tickets she handled.

88. Ms. Stewart was qualified for her position.

89. Before she disclosed her pregnancy, Ms. Stewart had never been disciplined.

90. When Ms. Stewart was eighteen years old, she was seriously injured in a car accident.

91. As a result of the accident, Ms. Stewart has metal hardware in her pelvis.

92. After the accident, Ms. Stewart had to relearn how to walk.

93. Ms. Stewart has a record of an impairment that substantially limited her ability to walk.

94. Ms. Stewart continues to receive injections for back pain caused by the injury.

95. Because of the metal hardware, Ms. Stewart's pelvis cannot expand as a pregnancy progresses.

96. For that reason, a pregnancy carried by Ms. Stewart is high risk.

97. For that reason, Ms. Stewart's doctors planned a scheduled cesarean delivery, with a longer recovery.

98. Ms. Stewart's pelvic impairment substantially limits her reproductive functions, a major bodily function under 42 U.S.C. § 12102(2)(B).

99. Ms. Stewart's pelvic impairment substantially limits her genitourinary function, a major bodily function under 29 C.F.R. § 1630.2(i)(1)(ii).

100. Ms. Stewart's pelvic impairment substantially limits the major life activity of reproduction.

101. The complications of Ms. Stewart's pregnancy, combined with her pelvic impairment, further limited her reproductive functions and her ability to lift.

102. Ms. Stewart is an individual with a disability under 42 U.S.C. § 12102(1)(A) and (B).

103. On or about September 24, 2025, Ms. Stewart learned she was pregnant.

104. The same day, Ms. Stewart told her supervisor, Chris Alfieri.

105. Chris Alfieri is Guy Alfieri's son.

106. Ms. Stewart told Mr. Alfieri she needed to see a doctor to confirm the pregnancy.

107. Ms. Stewart told Mr. Alfieri the pregnancy might be high risk.

108. Ms. Stewart told Mr. Alfieri the pregnancy was high risk because of the metal hardware in her pelvis.

109. Before Ms. Stewart returned from the doctor, Mr. Alfieri told other employees she was pregnant.

110. Ms. Stewart had not given Mr. Alfieri permission to share her medical information.

111. Ms. Stewart's doctor confirmed the pregnancy was high risk.

112. Her doctor told her she would need more frequent prenatal appointments.

113. Her doctor told her she might be placed on bedrest.

114. Her doctor restricted her to lifting no more than five to ten pounds.

115. Ms. Stewart told Mr. Alfieri about her lifting restriction.

116. Ms. Stewart gave CarCare a doctor's note identifying her lifting restriction.

117. Ms. Stewart's job did not require her to lift more than five pounds.

118. Before the restriction, Ms. Stewart helped a coworker check in heavy parts and batteries.

119. After the restriction, Ms. Stewart could no longer do so.

120. Ms. Stewart asked for time off to attend her prenatal appointments.

121. Ms. Stewart gave CarCare a doctor's note for each prenatal appointment.

122. Ms. Stewart told Mr. Alfieri her doctor might place her on bedrest later in the pregnancy.

123. Each request sought a reasonable accommodation for known limitations arising from her pregnancy and her disability.

124. No one at CarCare or CarSmart ever discussed accommodations with Ms. Stewart.

125. No one at CarCare or CarSmart told Ms. Stewart about her right to pregnancy accommodations.

126. Defendants never engaged in an interactive process with Ms. Stewart.

127. Shortly after Ms. Stewart disclosed her pregnancy, Mr. Alfieri began taking high-dollar repair tickets away from her.

128. Mr. Alfieri kept some of those tickets for himself.

129. Mr. Alfieri gave others to Jake Schneider, a male Service Advisor.

130. Mr. Schneider was not pregnant.

131. Because Ms. Stewart was paid on commission, her earnings dropped.

132. After Ms. Stewart disclosed her pregnancy, she was subjected to sexist comments at work.

133. On or about October 8, 2025, Mr. Alfieri issued Ms. Stewart a written Disciplinary Report.

134. The report came about two weeks after Ms. Stewart disclosed her pregnancy.

135. The report was the first discipline of Ms. Stewart's employment.

136. The report told Ms. Stewart to "leave her emotions at the door."

137. The report also faulted Ms. Stewart for "personal issues."

138. Mr. Alfieri knew Ms. Stewart's pregnancy was unexpected and emotionally difficult for her.

139. The comments about emotions and personal issues were aimed at Ms. Stewart's pregnancy.

140. The report charged Ms. Stewart with violating CarCare's Attendance Policy and Time Management Policy.

141. The report counted Ms. Stewart's pregnancy-related time away from work against her.

142. Ms. Stewart had given CarCare doctor's notes for her pregnancy-related appointments.

143. The report also cited an early departure on August 30, 2025.

144. The August 30 departure occurred almost a month before Ms. Stewart disclosed her pregnancy.

145. CarCare did not discipline Ms. Stewart for the August 30 departure until after it learned she was pregnant.

146. The report also cited a September 15, 2025, error in recording a vehicle model.

147. On November 3, 2025, Defendants fired Ms. Stewart.

148. The termination came forty days after Ms. Stewart disclosed her pregnancy.

149. The termination came only weeks after the Disciplinary Report.

150. Mr. Alfieri told Ms. Stewart Defendants had "found someone better for a long term fit."

151. Defendants replaced Ms. Stewart with a male employee.

152. Upon information and belief, her replacement was less qualified than Ms. Stewart.

153. In its position statement to the EEOC, CarCare gave a different reason for the termination.

154. CarCare told the EEOC it fired Ms. Stewart for the performance and policy issues listed in the Disciplinary Report.

155. Defendants' shifting explanations are pretext.

156. Defendants fired Ms. Stewart because of her pregnancy, her disability, and her requests for accommodation.

157. Ms. Stewart lost her employer health insurance when Defendants fired her.

158. Ms. Stewart lost her insurance in the middle of a high-risk pregnancy.

159. Defendants' conduct caused Ms. Stewart severe emotional distress.

160. Defendants' conduct exacerbated the stress of her high-risk pregnancy.

161. Defendants acted with malice or reckless indifference to Ms. Stewart's federally protected rights.

**COUNT I- Pregnancy Discrimination in Violation of Title VII**
**(42 U.S.C. § 2000e-2(a)(1))**

162. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

163. Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of sex. 42 U.S.C. § 2000e-2(a)(1).

164. Discrimination "because of sex" includes discrimination because of pregnancy, childbirth, or related medical conditions. 42 U.S.C. § 2000e(k).

165. Ms. Stewart was pregnant, and Defendants knew it.

166. Ms. Stewart was qualified for her position.

167. Defendants diverted Ms. Stewart's commission tickets, disciplined her, and fired her.

168. Defendants treated Mr. Schneider, who was not pregnant, more favorably.

169. Defendants replaced Ms. Stewart with a male.

170. Ms. Stewart's pregnancy was a motivating factor in, and the but-for cause of, each adverse action.

171. Defendants' stated reasons are pretext for pregnancy discrimination.

172. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

173. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

174. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT II- Retaliation in Violation of Title VII**
**(42 U.S.C. § 2000e-3(a))**

175. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

176. Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

177. Title VII requires an employer to treat women affected by pregnancy or related medical conditions the same as other persons similar in their ability or inability to work. 42 U.S.C. § 2000e(k).

178. Ms. Stewart engaged in protected activity when she told Defendants she was pregnant.

179. Ms. Stewart engaged in protected activity when she told Defendants her pregnancy was high risk.

180. Ms. Stewart engaged in protected activity when she told Defendants she might need bedrest and leave later in the pregnancy.

181. Ms. Stewart engaged in protected activity when she told Defendants about her lifting restriction.

182. Ms. Stewart engaged in protected activity when she asked for time off to attend her prenatal appointments.

183. Through each notice and request, Ms. Stewart asserted her right under Title VII to be treated the same as other employees similar in their ability or inability to work.

184. Ms. Stewart opposed Defendants' pregnancy discrimination.

185. Defendants knew of Ms. Stewart's protected activity.

186. After Ms. Stewart's protected activity, Defendants diverted her commission tickets, issued her first discipline, and fired her.

187. Each of these actions would dissuade a reasonable worker from engaging in protected activity.

188. Defendants issued the Disciplinary Report about two weeks after Ms. Stewart disclosed her pregnancy.

189. Defendants fired Ms. Stewart forty days after she disclosed her pregnancy.

190. The close timing between Ms. Stewart's protected activity and the adverse actions shows a causal connection.

191. Defendants would not have diverted Ms. Stewart's tickets, disciplined her, or fired her but for her protected activity.

192. Defendants' stated reasons are pretext for retaliation.

193. Ms. Stewart pleads this count in addition to, and in the alternative to, her claims under the PWFA and the ADA. Fed. R. Civ. P. 8(d)(2).

194. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

195. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

196. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT III- Failure to Accommodate in Violation of the PWFA**
**(42 U.S.C. § 2000gg-1(1))**

197. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

198. The PWFA makes it unlawful for a covered entity not to make reasonable accommodations to the known limitations related to an employee's pregnancy, absent undue hardship. 42 U.S.C. § 2000gg-1(1).

199. Ms. Stewart was a qualified employee under 42 U.S.C. § 2000gg(6).

200. Ms. Stewart communicated known limitations to Defendants under 42 U.S.C. § 2000gg(4): her need for frequent prenatal appointments, her lifting restriction, and the possibility of bedrest.

201. Ms. Stewart requested time off for prenatal appointments.

202. Instead of accommodating her, Defendants disciplined Ms. Stewart for her time away and then fired her.

203. Defendants never engaged in an interactive process with Ms. Stewart.

204. The accommodations Ms. Stewart needed would not have imposed an undue hardship on Defendants.

205. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

206. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

207. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT IV- Adverse Action and Denial of Opportunities in Violation of the PWFA (42 U.S.C. § 2000gg-1(3), (5))**

208. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

209. The PWFA makes it unlawful to deny employment opportunities to a qualified employee based on the need to make reasonable accommodations. 42 U.S.C. § 2000gg-1(3).

210. The PWFA also makes it unlawful to take adverse action against a qualified employee for requesting or using a reasonable accommodation. 42 U.S.C. § 2000gg-1(5).

211. Ms. Stewart requested and used reasonable accommodations for known limitations related to her pregnancy.

212. Defendants denied Ms. Stewart employment opportunities by diverting her high-dollar repair tickets.

213. Defendants disciplined Ms. Stewart for using time off for prenatal appointments.

214. Defendants fired Ms. Stewart because she requested and used reasonable accommodations.

215. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

216. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

217. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT V- Interference in Violation of the PWFA (42 U.S.C. § 2000gg-2(f)(2))**

218. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

219. The PWFA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights protected by the Act. 42 U.S.C. § 2000gg-2(f)(2).

220. Defendants disciplined Ms. Stewart for time away from work for prenatal appointments.

221. The discipline warned Ms. Stewart against using the accommodations the PWFA guarantees.

222. Defendants then fired Ms. Stewart, ending her ability to use those accommodations at all.

223. Defendants interfered with Ms. Stewart's exercise and enjoyment of her rights under the PWFA.

224. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

225. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

226. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT VI- Disability Discrimination in Violation of the ADA**
**(42 U.S.C. § 12112(a))**

227. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

228. The ADA forbids a covered entity from discriminating against a qualified individual on the basis of disability in discharge and other terms of employment. 42 U.S.C. § 12112(a).

229. Ms. Stewart has a disability and a record of a disability. 42 U.S.C. § 12102(1)(A), (B).

230. Ms. Stewart could perform the essential functions of her job with or without reasonable accommodation.

231. Defendants knew of Ms. Stewart's disability.

232. Defendants diverted her tickets, disciplined her, and fired her because of her disability.

233. Defendants' stated reasons are pretext for disability discrimination.

234. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

235. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

236. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT VII- Failure to Accommodate in Violation of the ADA**
**(42 U.S.C. § 12112(b)(5)(A))**

237. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

238. The ADA defines discrimination to include not making reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability, absent undue hardship. 42 U.S.C. § 12112(b)(5)(A).

239. Ms. Stewart is a qualified individual with a disability.

240. Defendants knew of Ms. Stewart's disability and the limitations it caused during her pregnancy.

241. Ms. Stewart requested a reasonable accommodation: time off for medical appointments and lifting restrictions.

242. Defendants did not engage in the interactive process.

243. Defendants penalized Ms. Stewart for her medical appointments instead of accommodating them.

244. The requested accommodations would not have imposed an undue hardship on Defendants.

245. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

246. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

247. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT VIII- Retaliation in Violation of the ADA**
**(42 U.S.C. § 12203(a))**

248. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

249. The ADA forbids discrimination against any individual because the individual opposed a practice made unlawful by the ADA or exercised rights under it. 42 U.S.C. § 12203(a).

250. Ms. Stewart engaged in protected activity when she requested reasonable accommodations for her disability.

251. Defendants knew of her requests.

252. Defendants disciplined Ms. Stewart and then fired her.

253. The close timing between her requests, the discipline, and the termination shows a causal connection.

254. Defendants would not have disciplined or fired Ms. Stewart but for her requests for accommodation.

255. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

256. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

257. Defendants acted with malice or reckless indifference to Ms. Stewart's protected rights, entitling her to punitive damages.

**COUNT IX- Sex Discrimination in Violation of the THRA**
**(Tenn. Code Ann. § 4-21-401(a)(1))**

258. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

259. The THRA makes it a discriminatory practice for an employer to discharge or otherwise discriminate against an individual because of sex. Tenn. Code Ann. § 4-21-401(a)(1).

260. Defendants together employed eight or more persons within Tennessee.

261. Defendants diverted Ms. Stewart's tickets, disciplined her, and fired her because of her sex, including her pregnancy.

262. Defendants' stated reasons are pretext for sex discrimination.

263. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

264. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

**COUNT X- Retaliation in Violation of the THRA**
**(Tenn. Code Ann. § 4-21-301(a))**

265. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

266. The THRA makes it a discriminatory practice to retaliate or discriminate against a person because that person opposed a practice the THRA declares discriminatory. Tenn. Code Ann. § 4-21-301(a).

267. Ms. Stewart engaged in protected activity under the THRA through the notices, requests, and opposition described above.

268. Defendants knew of Ms. Stewart's protected activity.

269. Defendants diverted Ms. Stewart's commission tickets, disciplined her, and fired her because of her protected activity.

270. The close timing between Ms. Stewart's protected activity and the adverse actions shows a causal connection.

271. Defendants' stated reasons are pretext for retaliation.

272. Ms. Stewart pleads this count in addition to, and in the alternative to, her claims under the TPWFA and the TDA. Fed. R. Civ. P. 8(d)(2).

273. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

274. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

**COUNT XI- Failure to Accommodate in Violation of the TPWFA**
**(Tenn. Code Ann. § 50-10-103(b)(1))**

275. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

276. The TPWFA makes it an unlawful employment practice to fail or refuse to make reasonable accommodations for medical needs arising from pregnancy, unless the employer shows undue hardship. Tenn. Code Ann. § 50-10-103(b)(1).

277. Ms. Stewart had medical needs arising from her pregnancy: frequent prenatal appointments, a lifting restriction, and possible bedrest.

278. Defendants together employed fifteen or more employees, making them an employer under the TPWFA.

279. Defendants knew of those needs.

280. Defendants did not accommodate those needs. They disciplined Ms. Stewart for her appointments and fired her.

281. Accommodating Ms. Stewart would not have imposed an undue hardship on Defendants.

282. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

283. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

**COUNT XII- Adverse Action in Violation of the TPWFA**
**(Tenn. Code Ann. § 50-10-103(b)(3))**

284. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

285. The TPWFA makes it an unlawful employment practice to take adverse action against an employee for requesting or using a reasonable accommodation for medical needs arising from pregnancy. Tenn. Code Ann. § 50-10-103(b)(3).

286. Ms. Stewart requested and used time off for prenatal appointments.

287. Defendants counted that time against Ms. Stewart in the Disciplinary Report.

288. Defendants then fired Ms. Stewart because she requested and used reasonable accommodations.

289. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

290. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

**COUNT XIII- Disability Discrimination in Violation of the TDA**
**(Tenn. Code Ann. § 8-50-103(b))**

291. Ms. Stewart incorporates each preceding paragraph as if fully set forth here.

292. The TDA forbids a private employer from discriminating in firing and other terms of employment based on a physical disability. Tenn. Code Ann. § 8-50-103(b).

293. Ms. Stewart's disability did not prevent her from performing the duties of her job.

294. In the alternative, Defendants fired Ms. Stewart solely because of her disability.

295. Ms. Stewart pleads this count in the alternative under Fed. R. Civ. P. 8(d)(2).

296. As a direct result, Ms. Stewart has lost wages, commissions, and benefits, and will continue to lose them.

297. As a direct result, Ms. Stewart has suffered emotional pain, humiliation, inconvenience, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Stewart respectfully asks the Court to enter judgment against Defendants, jointly and severally, and to award:

(1) A declaration that Defendants violated Title VII, the PWFA, the ADA, the THRA, the TPWFA, and the TDA;

(2) Back pay, lost commissions, and lost benefits, with prejudgment interest;

(3) Reinstatement or, in the alternative, front pay;

(4) Compensatory damages for emotional distress, humiliation, and other non-economic losses;

(5) Punitive damages;

(6) Reasonable attorney's fees and costs as provided by statute, including Tenn. Code Ann. § 50-10-104(b);

(7) Post-judgment interest; and

(8) All other legal and equitable relief to which she is entitled.

**JURY DEMAND**

Ms. Stewart demands a jury on all issues so triable.

Respectfully submitted,

**THE EMPLOYMENT & COMMERCE LAW GROUP**

*/s/ G. BRANDON HALL*
G. BRANDON HALL, BPR No. 034027
1625 Broadway, Suite 601
Nashville, Tennessee 37203
(615) 850-0632
bhall@eclaw.com

*Attorney for Plaintiff*